(No. 26602.— ■■■■■■■■■)
EARL ABNER REED *et al.* Appellants, *vs.* MARY ELLEN
EASTIN *et al.* Appellees.

*Opinion filed May 13, 1942.*

KERN, PEARCE & PEARCE, for appellants.

F. MARK MILLER, and MURRAY & MURRAY, (MATTHEW E. MURRAY, of counsel,) for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

The controlling issue presented for decision by this appeal is whether an oil and gas lease to 40 acres of land in Clay county, executed by Mary Ellen and Leo C. Eastin to Leon Pommier on February 19, 1941, and recorded March 3, 1941, is superior to an instrument denominated "Sale of Oil and Gas Royalty," executed by the same grantors to Earl Abner Reed and his wife, Helen S. Reed, on February 24, 1941, and placed of record the next day. Disposition of this question is, in turn, dependent upon whether Reed, on February 24, 1941, as a matter of fact, had actual notice of the lease or knowledge of such facts and circumstances as would put a reasonable man on inquiry. March 24, 1941, plaintiffs, Reed and his wife, filed their complaint in the circuit court of Clay county seeking the removal of the lease as a cloud upon the interests conveyed to them. The principal defendant, the National Refining Company, assignee of the lease, answered the original, the amended, and the supplemental complaint, averring that any rights which might have been acquired by plaintiffs were subject to the lease and consisted only of an undivided one-half interest to the one-eighth royalty reserved by the grantors under the lease to Pommier. The other defendants, Mary Ellen and Leo C. Eastin, did not interpose an answer. Evidence was heard, and the chancellor found that at the time of the execution of the instrument captioned "Sale of Oil and Gas Royalty" on February 24, 1941, plaintiffs had actual notice of the prior execution of the lease to Pommier, that the later instrument was subject to all the terms and conditions of the lease and that, consequently, plaintiffs were not entitled to the relief sought.

A decree was rendered dismissing the amended complaint, as supplemented, for the want of equity. Plaintiffs prosecute a direct appeal, a freehold being necessarily involved.

From the pleadings and the evidence adduced the following pertinent facts and circumstances appear: February 19, 1941, Mary Ellen Eastin owned the 40 acres in controversy. On the day named, she and her husband, Leo, executed and delivered to Pommier an oil and gas lease upon the entire tract. The signatures of the grantors were acknowledged before Lon S. Tolliver, a notary public. Pommier accompanied Eastin to the residence of Barry Franklin who executed a like lease to Pommier. The two leases were then taken to the Clay City Banking Company at Clay City where they were deposited with J. E. Gibbs, an officer of the bank. Pommier instructed Gibbs to hold the lease from Mrs. Eastin and her husband fifteen days pending a title search. Eastin assented to this arrangement, the understanding being that if the abstract of title was satisfactory and Pommier deposited the agreed price of $80 within fifteen days, Pommier was to be entitled to the possession and enjoyment of the lease. Gibbs wrote out the terms of the instructions given him on an envelope in which he placed the lease. His notation follows: "Lease and contract—for 40 acres—Rate of 2.00 per acre to be paid within 15 days from this date or Lease and contract forfeited to Mary Ellen Eastin and Leo Eastin." Pommier, it is admitted, was acting in behalf of the National Refining Company. The latter obtained an abstract of title, caused it to be examined by its attorneys, and on March 3, 1941,—within the prescribed period of fifteen days,—deposited $80 to the account of Mary Ellen and Leo C. Eastin in the Clay City Banking Company and the lease was given to Pommier. Thereafter, on March 3, 1941, the oil and gas lease was recorded. Later, on March 4, Pommier and his wife assigned the oil and gas lease to the National Refining Company. The assignment was recorded March 5.

In the meantime, on February 24, 1941, Reed and his wife, accompanied by Tolliver, called upon Mrs. Eastin and her husband at their home for the purpose of purchasing from them a portion of their oil and gas royalty interest. Reed, it appears, has been engaged in the oil business about thirty years, and was familiar with various types of oil and gas conveyances. Tolliver had assisted Reed in taking leases in the vicinity, and had acted as notary public for Reed in other transactions. Indeed, Tolliver had previously attempted, on behalf of Reed, to obtain a lease from Eastin. From Reed's testimony it appears that in the course of the negotiations on February 24, in response to a query, Eastin answered he did not know whether the tract of 40 acres was leased, adding "I gave another fellow fifteen days to take it or leave it." Reed testified that upon being advised Eastin received no payment, he said: "If that is all there is to it, that would not make any difference to me about buying the royalty and would not stop you from proceeding." Eastin's testimony is to the same effect. According to Reed, he thought Eastin had merely given his word to someone that he would only have fifteen days to come back and accept the lease, stating he was sure that when this proposed lessee returned for a lease and found the grantors had sold their oil and gas rights, he would pursue the usual procedure and refuse to take a lease. The result of the meeting on February 24 was that a price of $300 was agreed upon and paid for one-half the royalty, and Mrs. Eastin and her husband executed the instrument described as "Sale of Oil and Gas Royalty," conveying an undivided one-half interest in and to all of the oil and gas in or under the tract of 40 acres, the conveyance being made subject to any valid and subsisting oil and gas lease on the land. The next day, namely, February 25, 1941, as recounted, Reed caused the instrument to him to be duly recorded. Upon the trial, Reed disclaimed knowledge of the lease. Eastin testified that neither he nor his wife

mentioned the fact that their land had already been leased for oil. Mrs. Eastin said she did not tell Reed of the execution of the lease because he never asked about it. Tolliver asserted that "not a word" was uttered by anyone in his presence about the lease, explaining that he remained silent as "I presumed at that time it was Mr. Eastin's business, not mine." Reed stated that before departing Eastin inquired whether he (Reed) would pay three dollars an acre for the lease on the property in the event the other party (Pommier) did not come back. Reed replied in the affirmative, saying, "Yes, I would rather have your lease than this royalty." Thereupon, Eastin advised Reed that the other party had fifteen days to take the lease out of the bank, his time expiring March 6, and Reed replied that he would return on March 7. According to Reed, he first learned of the existence of the lease on March 1, 1941. He testified that he communicated with Eastin and asked why the latter did not disclose the execution of the lease at the time of the sale of the oil and gas rights on February 24, and that Eastin replied, "You did not ask me."

Subsequent acts of Tolliver, Mrs. Eastin and her husband, require recounting. On March 4, 1941, Tolliver made an affidavit that when he took the acknowledgments of the grantors on February 24, they told Reed about the prior oil and gas lease and also informed him that the oil and gas royalty conveyance of February 24 was made subject to the lease of February 19, and, further, that they told Reed the lease was a valid and subsisting oil and gas lease on the property covered by the royalty conveyance. Similarly, on March 5, 1941, Mary Ellen and Leo Eastin signed an affidavit reciting that on the day of the sale and conveyance of the oil and gas royalty on February 24, they advised Reed they had already made and entered into a valid and subsisting oil and gas lease on February 19 to Pommier, and that the conveyance was made subject to the

lease. By an affidavit executed on March 7, 1941, Tolliver declared that neither Eastin nor his wife, during the negotiations on February 24, gave Reed or the latter's wife notice they had theretofore signed and acknowledged an oil and gas lease, and, further, that he did not inform the grantees the grantors had executed a "proposed" oil and gas lease until several days thereafter. Subsequently, on March 15, Mrs. Eastin and her husband executed another affidavit stating that they did not comprehend the meaning of the contents or the purpose for which their earlier affidavit was obtained; that they signed it solely because an attorney of their own choice advised them (1) it was all right and (2) its only meaning was that the oil and gas lease described therein was dated February 19, 1941, and the date of the conveyance to Reed and his wife was February 24, 1941, and that they did not give Reed or his wife any notice whatsoever there was any oil and gas lease outstanding on their land. This supplementary affidavit also recites the gist of the conversations by and between Reed and Eastin and his wife on February 24, and is substantially to the same effect as the testimony of the parties previously recounted. Tolliver added that the information given in the last affidavit made by Mary Ellen and Leo Eastin was true to his personal knowledge.

The legal principles applicable to the present factual situation are firmly settled. Section 30 of the Conveyances act (Ill. Rev. Stat. 1941, chap. 30, par. 29, p. 763) ordains: "All deeds, mortgages and other instruments of writing which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." Public records of conveyances and

instruments affecting the title to real estate are established by statute to furnish evidence of such title, and a purchaser may rely upon such records in security unless he has notice, or is chargeable in some way with notice, of a claim, estate or interest inconsistent therewith. (*Marsh* v. *Stover,* 363 Ill. 490; *Bullard* v. *Turner,* 357 id. 279.) It has long been recognized, however, that the statute gives a priority to the deed first recorded only where the grantee of the recorded deed has acted fairly and in good faith. (*Struve* v. *Tatge,* 285 Ill. 103; *Ryder* v. *Rush,* 102 id. 338; *McConnel* v. *Reed,* 4 Scam. 117.) A subsequent purchaser who has notice before he buys a particular parcel that a deed has been executed to another person is bound by the former deed even though his own deed be recorded first. (*Struve* v. *Tatge, supra; Stokes* v. *Riley,* 121 Ill. 166; *Morrison* v. *Kelly,* 22 id. 609.) Again, one having notice of facts which would put a prudent man on inquiry is chargeable with knowledge of other facts which he might have discovered by diligent inquiry. Whatever is notice enough to excite attention and put the party on his guard is notice of everything to which such inquiry might have led and every unusual circumstance is a ground of suspicion and demands investigation. (*Cessna* v. *Hulce,* 322 Ill. 589; *Blake* v. *Blake,* 260 id. 70; *McConnel* v. *Reed, 'supra.*) The burden of proof is, of course, upon the person charging notice to prove it. *Cessna* v. *Hulce, supra; Lowden* v. *Wilson,* 233 Ill. 340; *Ryder* v. *Rush, supra.*

The evidence discloses that Reed was an experienced operator, familiar with conveyances relating to oil and gas; that, according to his own testimony, under the guise of acquiring royalty interests, he deliberately attempted to prevent the sale of the oil and gas lease on the tract in controversy to any other person after having previously failed to obtain the lease himself; that Tolliver, the notary public before whom the acknowledgments of Mrs. Eastin

and her husband were taken, both on the day they executed the oil and gas lease and, also, when they executed the instrument referred to as "Sale of Oil and Gas Royalty" to plaintiffs, had assisted Reed in taking other leases in the area, had unsuccessfully attempted to purchase for him a lease on the property involved in this action, and had told Reed about some tracts which were leased and others which were not leased; that Eastin, at the time of the transaction with Reed, on February 24, expressed doubt as to whether he could sell his royalty interest since he was uncertain whether the land was leased, having given another person fifteen days to take it or leave it, and that, answering, Reed expressed his desire to purchase the lease at a future date if the other party did not take it. The foregoing and other circumstances, including the affidavits voluntarily executed by Tolliver, Mary Ellen and Leo Eastin on March 4 and 5, as well as the later affidavits seeking to repudiate their earlier statements on the matter of notice, admit of but one conclusion, namely, that, on February 24, Reed either had actual knowledge of the execution of the oil and gas lease of February 19, or, in any event, was well aware of facts reasonably tending to excite suspicion and which were sufficient to put him upon further inquiry. In our opinion, the evidence amply sustains the conclusion of the chancellor that the defendant National Refining Company sustained its burden of proving notice on the part of plaintiffs.

Plaintiffs' contention that the oil and gas lease was not delivered to Pommier on February 19 is without merit. Delivery of a deed to a third person for the grantee or lessee, where the grantor intends to divest himself of control of the instrument and parts with its control, effects a delivery at the time of the manual transfer. (*VanEpps* v. *Arbuckle*, 332 Ill. 551; *Struve* v. *Tatge, supra; Clark* v. *Clark*, 183 Ill. 448; *Leiter* v. *Pike*, 127 id. 287; *Byars* v.

*Spencer,* 101 id. 429.) Here, uncontradicted testimony demonstrates that the grantors intended to and did part with control of the lease on February 19, 1941.

Plaintiffs make the contention that the agreement between Eastin and Pommier pursuant to which the lease was placed with Gibbs is within the Statute of Frauds and, hence, unenforceable. The Statute of Frauds was not even mentioned in plaintiffs' successive pleadings. Having failed to invoke the statute, plaintiffs are deemed to have waived its benefits, if any, which otherwise might have been open to them. Manifestly, they cannot have recourse to the Statute of Frauds for the first time in a court of review. *Richards* v. *Davis,* 352 Ill. 277; *Troup* v. *Hunter,* 300 id. 110.

Other contentions urged, and the supporting arguments, have been considered. Extension of this opinion by a discussion of the additional points made is deemed unnecessary.

The decree of the circuit court is right, and it is affirmed.

*Decree affirmed.*